Filed 2/24/22  In re Samuel L. CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re SAMUEL L., <br><br> a Person Coming Under the Juvenile Court Law. | B312657 <br><br> (Los Angeles County Super. Ct. No. 18CCJP01678) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br>    Plaintiff and Respondent, <br><br>    v. <br><br> BLANCA L. et al., <br><br>    Defendants and Appellants. | ORDER MODIFYING OPINION AND DENYING REHEARING; NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed on January 31, 2022, be modified as follows:

On page 22, second sentence of the second full paragraph beginning with "The juvenile" and ending with "adoption" is revised to read as follows:

> The juvenile court's ruling appears to rest on a comparison no longer allowed under the law, i.e., the parents' merits as custodial caregivers relative to those of the prospective adoptive parents.

There is no change in the judgment.

Respondent's petition for rehearing is denied.

_____

CRANDALL, J.[*]          ROTHSCHILD, P. J.          BENDIX, J.

---

[*] Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

2

Filed 1/31/22  In re Samuel L. CA2/1 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re SAMUEL L., a Person Coming Under the Juvenile Court Law. | B312657 (Los Angeles County Super. Ct. No. 18CCJP01678) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. BLANCA L., et al., Defendants and Appellants. | |

APPEALS from orders of the Superior Court of Los Angeles County, Michael D. Abzug, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Ernesto Paz Rey, under appointment by the Court of Appeal, for Defendant and Appellant Blanca L.

Jill S. Smith, under appointment by the Court of Appeal, for Defendant and Appellant Alberto L.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

_____

Blanca L. (mother) and Alberto L. (father) appeal from the denial of mother's request to change the juvenile court's order pursuant to Welfare and Institutions Code section 388[1] terminating mother's family reunification services with respect to their 11-year-old son, Samuel L. Both parents also appeal from the termination of their parental rights over Samuel following a hearing under section 366.26.

The parents argue that mother's section 388 petition should have been granted because, by the time of the combined hearings, mother had established a significant change in circumstances— namely, full compliance with her case plan—and because continued reunification services would be in Samuel's best interest.

By the time of the combined section 388 and section 366.26 hearings, Samuel had been under the jurisdiction of the dependency court for over three years. During much of that time, mother's unstable mental health, combined with father's inability to protect Samuel from mother's behaviors, caused Samuel well-

_____

[1] Subsequent undesignated statutory citations are to the Welfare and Institutions Code.

documented distress, instability, and trauma. Among other things, Samuel had received direct physical and emotional abuse at the hands of mother, he had missed over two-thirds of his first year of school, he had developed significant behavioral problems, and he had been re-placed and then quickly re-removed from mother's care again when her mental health promptly deteriorated. Mother's erratic behaviors included persistently taking Samuel out of school, discontinuing medications designed to help Samuel with his autism diagnosis, refusing to enlist the help of Samuel's service providers, and engaging in inconsistent visitation.

The parents' burden was to establish by a preponderance of the evidence that the proposed change in order, namely resumption of mother's reunification services, would promote Samuel's best interests. In light of the record before it, the juvenile court did not abuse its discretion in rejecting parents' request for resumption of mother's reunification services as being against Samuel's best interests.

We reach a different result with respect to the parents' assertion of the "beneficial relationship exception" to the termination of their parental rights under section 366.26. Shortly after the juvenile court issued its order terminating parental rights, our Supreme Court issued *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), which clarifies how juvenile and appellate courts must apply the three separate prongs of the beneficial relationship exception. *Caden C.* cautions that juvenile courts must not consider whether the parents are capable of resuming custody, or whether they are less capable of caring for the child than the potential adoptive parent. (*Id*. at p. 634.) The

juvenile court's brief oral ruling in this case plainly leaves open the possibility that it considered these now impermissible factors.

We are mindful of Samuel's pressing need for permanency, especially given his developmental and cognitive challenges following three tumultuous years of failed reunification efforts. However, the beneficial relationship exception is "a carefully calibrated process" intended to protect both the child as well as the rights of the parents. (*Caden C.*, *supra*, 11 Cal.5th at p. 625.) The juvenile court must therefore reevaluate how the exception applies in this case with the recent appellate guidance in mind.

Accordingly, we affirm the order terminating mother's request to resume reunification services but reverse and remand the juvenile court's orders terminating parental rights.

## FACTS AND PROCEDURAL BACKGROUND

### A. Removal and Detention

Mother and father met in 2004 and were married in 2006. Samuel was born in 2010.

On February 13, 2018, the Los Angeles County Department of Children and Family Services (the Department) received a referral alleging that mother had hit seven-year-old Samuel. The referral further alleged that mother had mental health issues, and that father was not adequately protective of Samuel.

A social worker met with the family on February 21, 2018. Father expressed frustration with Mother's escalating paranoia. He disclosed that the family had moved from their previous apartment after mother got into fights with the building manager and a maintenance worker, whom mother believed wanted to kill her and Samuel. She also believed that people at her new apartment were trying to kill her. Father had seen mother drive erratically with Samuel in the car because she believed that they

4

were being followed.  Father felt unable to help mother, and said that the situation made him feel hopeless.

Mother confirmed that she was schizophrenic,[2] and told social workers that she believed that "thuggish" men were following her and Samuel.  She refused to send Samuel to school because she believed his life was in danger.[3]  She claimed that she was currently taking her medication; father said that she was not.

Samuel evinced substantial behavioral difficulties during this interview.  He appeared scared and looked to mother for answers to the social worker's questions.  He was unable to sit still or follow simple directions from his parents, acted younger than his age, and behaved aggressively towards the family's dog.  Mother said that Samuel was taking medication for attention deficit hyperactivity disorder (ADHD), but could not provide any evidence of a diagnosis.  Neither parent could confirm whether Samuel had an individualized education plan (IEP) to accommodate any special needs or behavioral issues.  School personnel later confirmed that he did not have an active IEP.

On February 22, 2018, father called social workers to report that mother was threatening to take Samuel to New York or Florida.  He attempted to take her to a psychiatrist, but "she went in and came right back out."  When father tried to take

---

[2] Mother later backpedaled this assertion, claiming that she was not schizophrenic but instead schizoaffective.

[3] Social workers were later able to confirm that Samuel had extremely poor attendance at school, attending only 66 percent of his kindergarten year and 68 percent of his first-grade year.

mother to meet with social workers, mother tried to jump out of the moving car.

On March 12, 2018, the Department obtained a removal order and took Samuel into protective custody. Samuel told social workers that when mother has not taken her medication "she hits him," "slapp[ing] him on the face" or "throw[ing] things at him when he gets into trouble." He said that mother "hits hard when she hits him."

Samuel was placed with his maternal grandmother. He was formally detained from both parents on March 15, 2018. Mother and father were each granted monitored visitation.

## B. Jurisdiction and Disposition Hearing

On March 14, 2018, DCFS filed a petition alleging multiple grounds for jurisdiction over Samuel under section 300. Count a-1 alleged that mother had physically abused Samuel, by throwing objects at him and striking his face. Counts b-1 and b-2 alleged that mother's untreated mental illness rendered her unable to provide regular care for Samuel, and reiterated that mother's physical abuse put him at risk of severe physical harm. These counts also alleged that father failed to adequately protect Samuel from mother's abuse and erratic, paranoid behavior.

Mother denied all allegations against her, claiming that she was not schizophrenic, had no issues with paranoia or erratic behavior, and was appropriately treating her existing mental health conditions well. Father denied ever seeing mother hit Samuel, but confirmed that mother experienced paranoid psychosis when unmedicated. Father agreed that mother was now appropriately medicating herself.

On May 24, 2018, the juvenile court sustained the jurisdictional allegations against mother, but struck all

6

allegations that father had failed to protect Samuel. Mother and father received reunification services. Mother's case plan required, among other things, that she undergo psychiatric treatment, take all prescribed medication, and refrain from using corporal punishment against Samuel.

## C.      Supplemental Jurisdiction Petition

By November 26, 2018, mother and father appeared to be in full compliance with their case plans. Mother appeared stable, was participating in psychiatric treatment, and was reportedly taking her medications. Accordingly, the juvenile court returned Samuel to his parents' custody with family maintenance services and safety measures in place.

Just two months later, on January 25, 2019, the Department filed a supplemental jurisdictional petition pursuant to section 387, alleging that mother had once again physically abused Samuel.[4] The Department further alleged that mother failed to take her medications as prescribed, instead grinding her pills into powder and purporting to administer doses not approved by her psychiatrist. Father reported that he sometimes administered mother's pills, and he assumed that she took them on her own the rest of the time.

Mother also discontinued Samuel's medications, causing him to regress significantly. He became aggressive, throwing tantrums and refusing to go to school. Mother responded by resorting to physical violence, allegedly slapping Samuel, scratching his face, throwing him onto a couch and against a

---

[4] The Department also filed a section 342 petition alleging that mother and father had engaged in domestic violence in front of Samuel.

wall, pulling him by his ears, and physically restraining him with her hand over his mouth so that he could not scream for help. Samuel told social workers that he felt safer at his grandmother's house because his "heart [didn't] beat as fast" while there.

On January 22, 2019, the Department obtained another order authorizing Samuel's removal, and to be placed with his grandmother. On January 23, Mother asked to see Samuel before he was taken to his grandmother's house. She immediately became aggravated, told Samuel that although she loved him, he did not love her, and stormed away. Samuel was left in tears.

On March 26, 2019, the juvenile court sustained the supplemental jurisdiction petition against mother and father.[5]

## D.    Termination of Reunification Services

Over the next year, Samuel began to thrive. He was diagnosed with autism and placed in a special needs school. He began expressing fear about returning to mother's custody due to her mental health issues. He expressed the affirmative desire to remain with maternal grandmother, saying, "I don't want to move schools again and again, I enjoy this school and I have friends." He told social workers that "he doesn't want to feel like he keeps getting bounced around and he doesn't belong."

As Samuel's situation improved, mother's declined. She continued to experience mood swings and occasionally displayed

---

[5] The court again amended this petition by interlineation, striking language stating that mother's failure to take her prescribed medication "endanger[ed] [Samuel's] physical health and safety," but retaining the allegation that this failure "place[d] [Samuel] at risk of serious physical harm."

erratic behavior on visits with Samuel. She appeared to have discontinued her prescribed medication. On October 10,2019, she was psychiatrically hospitalized after an apparent nervous breakdown. Mother withheld consent to release information about the hospitalization or her diagnosis to the Department.

Mother and father began displaying an inability or unwillingness to recognize the nature of Samuel's special needs. On March 1, 2020, mother told social workers that "as soon as [Samuel] is released to father she is going to place [Samuel] in a 'normal school' because she does not believe [he] needs to be in a special education classroom because he is smart and deserves to be in a regular classroom." When the Department submitted a referral for Samuel to be assessed by the regional center for autism support services, mother refused to respond to service providers, delaying Samuel's assessment. As recently as January 20, 2021, father expressed unawareness of any diagnosis of autism or ADHD.

Despite his therapist's recommendation that father separate from mother to provide Samuel with a safe environment, father remained extremely reluctant to separate from mother. He reported being afraid of what she would do to him if he moved out. Mother told social workers that she and father would temporarily separate until father regained control of Samuel, but would immediately reunite and exercise joint custody when their case closed.

Mother and father also stopped complying with visitation orders. Grandmother had to intervene when mother attempted to physically discipline Samuel during visits. Father started missing visits. And both parents began showing up to grandmother's house unannounced, demanding visitation with

Samuel regardless of the agreed-upon visitation schedule. This caused Samuel to regress behaviorally, becoming overwhelmed to the point of missing treatments.

On March 9, 2020, the juvenile court terminated reunification services and set a section 366.26 hearing.

By this time, Samuel had made significant progress in therapy. He started to open up to his grandmother and therapists about his traumatic experiences with his parents. He told his grandmother, "you have no idea about the bad things my parents have done to me [translated from Spanish]." When he was six years old, he said that mother had asked Samuel to jump off a balcony because someone was trying to kill them. He also said that he had witnessed mother attempt suicide at least three times. Samuel felt that father "does not treat him like a person and during his visitation father does not talk to him."

Samuel told social workers he felt "a little afraid" of mother. Samuel wanted grandmother to continue monitoring his visits with his parents so that he could "feel[ ] safe" and so that grandmother "can end visits immediately if [they] go[ ] wrong." Samuel repeatedly expressed a desire to stay with his grandmother, but felt that he could not say so in front of mother because he feared that she "would kill herself." He admitted that he had lied to his and his mother's psychiatrist to prevent mother from finding out that he no longer wanted to live with her.

On January 11, 2021, the juvenile court transferred Samuel's educational rights to his grandmother because his "mental health ha[d] been impaired by . . . mother's failure to respond to the request to have regional services intervene and provide help." After receiving a regional services evaluation, grandmother committed to adopting Samuel.

10

Samuel reported that he wanted to remain in grandmother's care. When mother learned this, she became upset, called Samuel, and berated him, implying that he did not care for her. This caused Samuel profound distress.

### E.  Mother's Section 388 Petition

On January 7, 2021, mother filed a section 388 petition requesting that the juvenile court reinstate her reunification services. She argued that the circumstances of their case had changed because she was now in full compliance with her case plan, and that Samuel would benefit from being reunited with her and father.

On May 12, 2021, the petition proceeded to a contested hearing. As evidence, mother submitted letters from two psychiatrists attesting to her psychological progress, including the psychiatrist providing joint therapy to her and Samuel. After hearing argument, the juvenile court expressed compassion for mother's struggles, but denied her petition. The court expressed doubt about mother's ability to provide Samuel with stability and emotional support. However, even assuming that mother had achieved a modicum of stability, the court determined that it was in Samuel's best interests to remain with his grandmother.

### F.  Termination of Parental Rights

The juvenile court then held a section 366.26 hearing to determine whether mother and father's parental rights should be terminated. Mother and father argued that the parental-benefit exception should protect their parental rights. Mother testified that she and Samuel had developed a strong relationship. She said that he called her three to four times per day, and that these calls lasted between five and 30 minutes. She would help him with his homework, and he would volunteer ideas for future

11

visitation dates.  Sometimes he called just to see how she was doing.  Mother also testified that she had attended all of Samuel's medical appointments, and that after his autism diagnosis she had begun taking classes on strategies for parenting autistic children.  She argued that it would be in Samuel's best interest for her to retain parental rights because she could give him a better and more enriching life than grandmother.

Following mother's testimony, and in urging the court to terminate the parental rights of both parents, minor's counsel admitted that "Samuel loves both of his parents," and said that the "[m]aternal grandmother is more than open to allowing both parents to continue having a relationship with Samuel after he's adopted."  Minor's counsel also recognized that "Samuel does want to continue having a relationship with his parents."

Immediately before issuing its ruling terminating parental rights, the juvenile court stated:  "I realize that [Samuel is] seven years old, and I also realize that he has his own cognitive challenges, but the caregiver is committed to adoption and Samuel, as we observed, is comfortable and doing well with the grandmother and is not as comfortable with his mother it appears to me, and I do find based on the totality of the record as the mother's testimony would suggest."  Thereafter, the court went on to rule:  "The court finds by clear and convincing evidence that [Samuel] is adoptable and there are no . . . legal impediments to adoption. . . .  [A]nd based on the totality of the record and applying the requisite standard of evaluation required by law, the court finds that any benefit accruing to [Samuel] from his relationship with . . . parents is outweighed by the physical and emotional benefit [Samuel] will receive through the permanency and stability of adoption."

Mother and father timely appealed.

## DISCUSSION

### A.   Mother's Section 388 Petition

Mother argues that the juvenile court erred in denying her section 388 petition, which requested resumption of reunification services.  We review the denial for abuse of discretion.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)  " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason." ' "  (*Ibid.*)  Without such excesses, " ' "the reviewing court has no authority to substitute its decision for that of the trial court." ' "  (*Ibid.*)

Section 388 allows a parent to petition the juvenile court to change, modify, or set aside a previous order.  To succeed, the petitioner must "establish[ ] by a preponderance of the evidence that (1) new evidence or changed circumstances exist and (2) the proposed change would promote the best interests of the child."  (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.)[6]

When, as here, reunification services have been terminated and a section 366.26 hearing has been set, the juvenile court must recognize that the focus of the case has shifted from the parents' interest in the care, custody, and companionship of the child to the needs of the child for permanency and stability.  (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317.)  At this stage in the

[6] The Department also disputes whether mother produced new evidence or established changed circumstances.  Because the juvenile court based its ruling solely on the second prong of section 388, we focus our discussion on whether parents proved that the requested resumption of services would promote Samuel's best interests.

13

proceedings, the child's best interests "are not to further delay permanency and stability in favor of rewarding" the parent for his or her "hard work and efforts to reunify." (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.) "A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47, disapproved on other grounds in *Caden C.*, *supra*, 11 Cal.5th at p. 636, fn. 5.)

Mother's section 388 petition was based solely on her renewed compliance with her case plan. Her primary evidence included letters of commendation from her two psychiatrists, including the doctor who was providing joint therapy to mother and Samuel. Mother cites these letters as dispositive of her "effective . . . management of her mental health diagnoses."

Her briefs ignore the psychiatrists' conditional assessments of her progress. One doctor states that, based on his "limited" interactions with her, mother appeared compliant with her medication "[a]s far as [he] know[s]." The other writes that mother is "making excellent progress towards reunification," and recommends that Samuel and his mother "spend more time together."[7] While these letters attest to mother's *changing*

---

[7] Samuel later confessed that he falsely told this psychiatrist that he wanted to live with mother. He said that he lied "because if [he] said he did not want to live with his mother, [she] would kill herself."

14

attitude toward managing her mental health, they do not conclusively establish her stability.

We note the record is filled with contradictory evidence meriting a cautious assessment of mother's psychiatric progress. She relapsed quickly the first time she regained custody of Samuel, taking him off his prescribed medications and subjecting him to additional physical and emotional abuse. (See *In re N.F.* (2021) 68 Cal.App.5th 112, 121, 122 [a parent's "history of completing programs and relapsing" evidences parental instability, and is thus relevant when evaluating whether a child's " 'best interests in *permanency and stability* would be furthered by' derailing the child's adoption"].)

Significantly, during the time when mother was being treated by both psychiatrists, she continued to display concerning attitudes regarding Samuel's special needs. For example, on January 5, 2021, one psychiatrist wrote that "[i]t is important for [Samuel's] parents to have a clear understanding of autism and [be] provided with parenting strategies through [Los Angeles Harbor] Regional Center or UCLA [a]utism program." The doctor stated that she would recommend reunification "[i]f parents comply with these services." The following week, the juvenile court transferred Samuel's educational rights to his grandmother because his "mental health ha[d] been impaired by . . . mother's failure to respond to the request to have regional services intervene and provide help." Two months after that, on March 2, 2021, mother continued to disregard the importance of his enrollment in regional center services, repeatedly demanding that Samuel be enrolled in Applied Behavior Analysis therapy sessions before completing his regional center evaluation.

15

Mother also made repeated unscheduled visits to Samuel's home, despite his therapist's conclusion that these unannounced visits were destabilizing Samuel's mental health. Samuel's counsel requested that the juvenile court admonish mother about this behavior as recently as March 10, 2021.

On March 24, 2021, upset after discovering that Samuel no longer wanted to live with her, mother disregarded grandmother's explicit instruction not to mention her disappointment to Samuel. Instead, she immediately called Samuel and told him that his desire to live with his grandmother implied that he did not care about mother. This deeply upset Samuel who, on April 14, 2021, told social workers that he "d[id]n't want his mother knowing of what he wants because she might do something to harm herself."

Mother's argument that her history of visitation and phone calls should be favorably interpreted is doubtful. Her briefs at best minimize, and at worst completely ignore, the harm she caused by disregarding the visitation schedule and emotionally manipulating Samuel over the phone. This incident alone shows a troubling lack of progress towards providing permanency and emotional support.

Based on the totality of this record, the juvenile court was justified in concluding that, after three years of failed attempts to achieve the stability Samuel needed, mother had not shown by a preponderance of the evidence that resumption of mother's reunification services would be in Samuel's best interests. (*In re Zachary G.*, *supra*, 77 Cal.App.4th at p. 808 [denying a § 388 petition where parent could not demonstrate that the proposed change would be in the child's best interests].)

16

## B.    Termination of Parental Rights

### 1.    *Relevant Law and Standard of Review*

" 'At a permanency plan hearing, the court may order one of three alternatives: adoption, guardianship or long-term foster care.  [Citation.]  If the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans.' [Citation.]" (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1224.) In other words, if the trial court finds that the child is adoptable, it must terminate parental rights *unless* a statutory exception applies.  (§ 366.26, subds. (b)(1) & (c)(1).)

One such exception is the beneficial relationship exception, which applies if "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)

A parent seeking the protection of this exception must establish, by a preponderance of the evidence, each of the following elements: (1) that the parent has regularly visited with the child; (2) that the child would benefit from continuing the relationship; and (3) that terminating the relationship would be detrimental to the child. (*Caden C.*, *supra*, 11 Cal.5th at p. 631; see § 366.26, subd. (c)(1)(B)(i); Evid. Code, § 115.)

Just two weeks after the juvenile court issued its order terminating parental rights, our Supreme Court published an opinion clarifying how juvenile and appellate courts must interpret and apply the parental benefit exception.  (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)  The Supreme Court's discussion regarding the third element of the test is particularly relevant here.  That element asks juvenile courts to ascertain whether

17

severing parental ties—and thus "terminating [the] parental relationship"—would be detrimental to the child.  (*Id.* at p. 633.) "What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life."  (*Ibid.*)

Because any harm caused by loss of this relationship may be significantly mitigated by the child's adoption into a stable, loving home, the court must then perform a delicate balancing act.  The "subtle, case-specific inquiry [that] the statute asks courts to perform [is]: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' "  (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent."  (*Id.* at pp. 633-634.)

*Caden C.* thus clarifies that the juvenile court's inquiry must focus on the quality of the child's relationship with the parent.  It is improper to "compar[e] the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)," or consider "whether the parent can provide a home for the child."  (*Caden C.*, *supra*, 11 Cal.5th at p. 634.)  "[T]he question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home."  (*Ibid.*)

In addition to these substantive clarifications, *Caden C.* also directs appellate courts to apply a hybrid standard of review to a juvenile court's analysis of the beneficial relationship

exception.  The first two elements of the exception, which require the juvenile court to "make a series of factual determinations" regarding visitation and the parent-child relationship, "are properly reviewed for substantial evidence." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)  These determinations should "be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

But "the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)  Accordingly, we will not disturb the juvenile court's decision unless it "exceed[s] the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 318.)

2.    *Analysis*

As we have said, the juvenile court found by clear and convincing evidence that Samuel is adoptable.  The parents do not dispute this finding.  Instead, they argue that the juvenile court erred by not utilizing the proper legal standard in evaluating the beneficial relationship exception.  They primarily fault the juvenile court for taking into consideration maternal grandmother's willingness to allow Samuel to continue having a relationship with his parents after she adopted him.  While the Department agrees that such an analysis would constitute error,[8]

---

[8] See *In re J.D.* (2021) 70 Cal.App.5th 833, 866, 868 (the degree to which "postadoption contact [is] not necessarily

19

it argues that the court did not take the probability of continued visitation into account when terminating mother and father's parental rights.

At a more basic level of analysis, we cannot determine from the record whether the court properly applied the correct legal standard when analyzing the three elements of the beneficial relationship exception, as clarified in *Caden C.* (See *In re Charlisse C.* (2008) 45 Cal.4th 145, 159 [a "disposition that rests on an error of law constitutes an abuse of discretion"].)

The first element, uncontested on this appeal, is that "both parents . . . have been visiting with [Samuel]." Our difficulty begins with the second element, which asks whether Samuel has a beneficial relationship with his parents. The juvenile court made no explicit ruling on the second element, instead jumping ahead to the third element's balancing test, holding that "based on the totality of the record and applying the requisite standard of evaluation required by law . . . *any* benefit accruing to [Samuel] from his relationship with his parents is outweighed by the physical and emotional benefit [he] will receive through the permanency and stability of adoption." (Italics added.) The juvenile court's ruling, reviewed in context, appears to have reached the conclusion that, even if parents had an extremely strong and positive relationship with Samuel, the detriment he

---

precluded . . . must be put aside in assessing whether a child would be harmed by the loss of a significant, positive emotional relationship with a natural parent to such a degree that it is the child's best interest to select some permanent plan short of adoption," "the juvenile court must assume that if it decides to sever parental rights, then parent and child will be left as not just legal strangers to one another but also literal strangers").

would suffer from the loss of that relationship would pale in comparison to the tremendous benefits he would receive from adoption.

In the wake of *Caden C.*, this approach to analyzing the beneficial relationship exception is highly problematic. *Caden C.* disproved of several considerations often used by juvenile and appellate courts applying the exception. In particular, courts are cautioned not to judge a parent's relationship with their child based solely on whether the parent acts (is capable of acting) as the child's custodian, or on the parent's "continued struggles" with the issues that led to dependency.[9] (*Caden C., supra*, 11 Cal.5th at pp. 634, 637.) And, courts must not compare a "parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)," as the permanency planning hearing "is decidedly not a contest of who would be the better custodial caregiver." (*Id.* at p. 634.)

In short, *Caden C.* instructs us that beneficial relationship exception "does not require being a good parent; it does not require that the parent have overcome the struggles that led to the dependency, and it does not require that the parent be capable of resuming custody." (*In re L.A.-O.* (2021) 73 Cal.App.5th 197, 210.) Instead, the juvenile and appellate courts must focus on "whether there is a substantial, positive emotional

---

[9] As the *Caden C.* court did, we note that a parent's struggles with the issues that led to the dependency are "relevant to the application of the [beneficial relationship] exception" to the extent that they are probative of whether a parent's interactions with his or her child negatively affects the child. (*Caden C., supra*, 11 Cal.5th at p. 637.)

attachment between the parent and child." (*In re D.M.* (2021) 71 Cal.App.5th 261, 270.)

We cannot determine from the record whether the juvenile court considered factors that *Caden C.* has held are forbidden. What we can say is that, immediately before its ruling, the juvenile court observed that Samuel "is comfortable and doing well with [his] grandmother," the prospective adoptive parent, and "is not as comfortable with his mother." The court went on to find "that it would be detrimental to [Samuel] to be returned to the parents." These statements call into question whether the juvenile court weighed the comparative merits of Samuel's adoptive and natural parents, and/or considered the degree to which mother and father could perform as Samuel's custodians. Further, while the juvenile court stated that it was "applying the requisite standard of evaluation required by law," it did so without any further explication and without the benefit of *Caden C.*'s direction.

The Department argues that any error was harmless. We are not persuaded. The juvenile court's ruling appears to rest on a comparison no longer allowed under the law, i.e., the detriment Samuel would suffer from the loss of a parental relationship as compared to the benefits he would accrue from adoption. "We cannot know how the court would have exercised its discretion if it had the benefit of the *Caden C.* analysis when making its ruling." (*In re D.M.*, *supra*, 71 Cal.App.5th at p. 271.)

While recognizing Samuel's urgent need for permanency, especially in light of his lengthy plight in dependency court, the beneficial relationship exception is "a carefully calibrated process" intended to protect both the child as well as the rights of the parents. (*Caden C.*, *supra*, 11 Cal.5th at p. 625.) The

22

juvenile court must therefore reevaluate the relevant factors with the recent appellate guidance in mind.  (*In re L.S.* (2014) 230 Cal.App.4th 1183, 1194; see also *In re L.A.-O*, *supra*, 73 Cal.App.5th at p. 212 [reversing and remanding because the reviewing court could not conclusively determine whether a termination order complied with the standards established by *Caden C.*]; *In re J.D.*, *supra*, 70 Cal.App.5th at p. 868 [reversing and remanding because the reviewing court "[could not] be certain [the juvenile court] properly evaluated the evidence when it came time to render its ultimate decision to terminate [the] mother's parental rights" prior to the publication of *Caden C.*].)

## DISPOSITION

The order denying parents' section 388 petition is affirmed.  The orders terminating parental rights are reversed.  The matter is remanded for the juvenile court to conduct a new section 366.26 hearing.

NOT TO BE PUBLISHED

CRANDALL, J.[*]

We concur:

ROTHSCHILD, P. J.          BENDIX, J.

_____

[*] Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

23